Zachariah J. TREDER, a minor, by his Guardian ad Litem, Joseph Weigel, Brian Treder and Lori Treder, Plaintiffs,

UNITED HEALTHCARE OF WISCONSIN, Subrogated-Plaintiff,

v.

LST, LIMITED PARTNERSHIP, d/b/a Lake Shore Towers, a Wisconsin Limited Partnership, Defendant,

COMMERCIAL UNION INSURANCE COMPANY, a foreign corporation, Defendant-Respondent,

BIECK MANAGEMENT, INC., Defendant,

WEST BEND MUTUAL INSURANCE COMPANY, Defendant-Appellant.†

LST, LIMITED PARTNERSHIP, d/b/a Lake Shore Towers, Plaintiff,

COMMERCIAL UNION MIDWEST INSURANCE COMPANY, Plaintiff-Respondent,

v.

BIECK MANAGEMENT, INC., Defendant,

WEST BEND MUTUAL INSURANCE COMPANY, Defendant-Appellant.†

Court of Appeals

† Petition to review denied 5-17-04.

771

*No. 03–0848. Oral argument December 19, 2003.—Decided March 9, 2004.*

2004 WI App 75

(Also reported in 679 N.W.2d 555.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Jeffrey Leavell* of *Jeffrey Leavell, S.C.*, of Racine, with oral argument by Jeffrey Leavell.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Michael T. Steber* of *Zimmerman & Steber Legal Group, S.C.*, of Brookfield, with oral argument by Michael T. Steber.

Before Fine, Schudson and Curley, JJ.

¶ 1. CURLEY, J. West Bend Mutual Insurance Company (West Bend) appeals the trial court's declara-

tory judgment making West Bend's policy responsible for the second layer of coverage for a $2,075,000 personal injury settlement. This coverage dispute arose out of an injury occurring in an apartment building owned by LST, Limited Partnership, d/b/a Lake Shore Towers (LST), and managed by Bieck Management, Inc. (Bieck). West Bend, whose policy names only Bieck as an insured, contends that Commercial Union Insurance Company (Commercial Union), whose umbrella policy names both Bieck and LST as insureds, should have been required to pay the remaining settlement amount after Commercial Union's general liability policy limit of $1,000,000 was exhausted. Alternatively, West Bend argues that its policy and Commercial Union's umbrella policy should both be considered excess policies and the remaining settlement amounts should be shared *pro rata* according to each policy's limits.

¶ 2. In *Oelhafen v. Tower Insurance Co.*, 171 Wis. 2d 532, 492 N.W.2d 321 (Ct. App. 1992), this court concluded that umbrella policies, such as Commercial Union's, "are regarded as true excess over and above any type of primary coverage, including excess provisions arising in regular primary policies[,]" *id.* at 539; thus, neither the "other insurance" clause found in Commercial Union's umbrella policy nor the "real estate managed property" endorsement found in West Bend's policy defeats the holding that umbrella policies are intended to be the last line of defense. Consequently, West Bend's policy was not on equal footing with Commercial Union's umbrella policy, and sharing the losses on a *pro rata* basis per the holding in *Schoenecker v. Haines*, 88 Wis. 2d 665, 277 N.W.2d 782 (1979), would be inappropriate.

## I. Background.

¶ 3. Zachariah Treder, then an infant, suffered severe and permanent head injuries when he was accidentally lifted into the whirring blades of a ceiling fan that was installed too low by Bieck employees in an apartment building owned by LST. Three insurance policies provided coverage for LST and Bieck. Bieck secured all of them. Two policies were written by Commercial Union, one of which was a commercial general liability policy with a limit of $1,000,000, and the other, an umbrella policy with a $3,000,000 policy limit. These two policies named both LST and Bieck as insureds. Bieck also purchased an insurance policy from West Bend with a policy limit of $1,000,000, naming only Bieck and its office.[1] However, this policy contained a "real estate managed property" endorsement covering Bieck in regard to the properties it managed.

¶ 4. A suit was commenced on Zachariah's behalf against LST and its insurance carrier, Commercial Union. As a result, LST and Commercial Union brought suit against Bieck and its insurance carrier, West Bend, seeking contribution. The parties also requested that the trial court determine the priority of coverage for the two remaining polices—West Bend's policy and Commercial Union's umbrella policy—as the parties stipulated that Commercial Union's general liability policy was first in line. The two lawsuits were later consolidated and the plaintiffs amended their complaint, adding Bieck and West Bend as defendants. As noted, the parties settled the claim for Zachariah's injuries.

---

[1] The policy names two offices. Testimony elicited at a deposition established this second address was a mistake.

¶ 5. The trial court concluded that pursuant to *Oelhafen*, after Commercial Union's general liability policy paid the first $1,000,000, West Bend's policy was responsible for the next layer of insurance, and Commercial Union's umbrella policy was responsible for any remaining monies.

## II. ANALYSIS.

¶ 6. West Bend claims that the trial court erred. First, it submits that Commercial Union's umbrella policy should have been ordered second in line because the intent and purpose of the insurance purchaser must be given weight when determining the priority of the policies. West Bend asserts that evidence established that Bieck purchased the West Bend policy to primarily cover the company and its business property, with the understanding that the West Bend policy would apply to managed properties only after Commercial Union's umbrella policy limit was exhausted.

¶ 7. Second, West Bend argues that since Commercial Union's umbrella policy named only its general liability policy as underlying insurance, the umbrella policy anticipated only $1,000,000 in underlying coverage before it would be required to pay. Thus, West Bend argues that it is unfair for Commercial Union to request West Bend to pay when Commercial Union's expectation was that the umbrella policy would be responsible for coverage after the $1,000,000 limit of the underlying insurance policy was met.

¶ 8. Third, West Bend contends that the trial court "overread" the language in *Oelhafen*, and insists that the trial court's reliance on *Oelhafen* was improper because the facts and policy language of the two cases are distinguishable. Finally, and alternatively, West

Bend proposes that its policy and the Commercial Union umbrella policy should both be considered excess policies. Relying on *Schoenecker*, West Bend submits that the wording of its "real estate property managed" endorsement makes its policy an excess policy over any other available insurance, and when compared to the "other insurance" clause found in Commercial Union's umbrella policy, the two clauses directly conflict. *Schoenecker* instructs that:

> The rule in Wisconsin, then, is that, where there are two applicable insurance policies, the provisions of each will be given effect if possible. If it is impossible to give effect to both because they are directly conflicting, then neither will be given effect and the loss will be prorated between the concurrent insurers.

88 Wis. 2d at 672–73. As a result, West Bend submits that neither policy should be given priority over the other. Instead, it proposes that each should contribute toward the loss on a *pro rata* basis. We remain unpersuaded by all of West Bend's arguments.

¶ 9.　This dispute requires us to interpret language found in the two insurance policies. The interpretation of insurance contracts presents a question of law. *Danbeck v. American Fam. Mut. Ins. Co.*, 2001 WI 91, ¶ 10, 245 Wis. 2d 186, 629 N.W.2d 150. We review questions of law without deference to the trial court. *See id.*

A. *The facts do not support West Bend's contentions concerning Bieck's intent and motive when purchasing the West Bend policy.*

¶ 10.　We first address West Bend's contention that the intent and purpose of the purchaser of the

policy—in this case, Kenneth Bieck—must be given great weight in deciding the priority of the policies. West Bend points to the deposition of Kenneth Bieck to establish that Mr. Bieck purchased the West Bend policy with the intent that it be in excess of the Commercial Union policies procured by him for both LST and Bieck. Even if we were to embrace West Bend's argument that the intentions of an insurance purchaser would be critical to our ordering of insurance coverage, our review of Bieck's deposition belies West Bend's contention. Bieck related that he purchased separate insurance for his company, but he offered no reason for the purchase, except to say that he wanted coverage for his business and office. Furthermore, he did not discuss his expectations in buying the insurance. Contrary to West Bend's assertion, Mr. Bieck offered no opinion as to which policy should apply first. In fact, in his deposition, Bieck never mentions the words "primary," "excess," or "umbrella." Consequently, the record is totally devoid of any support for this argument.

*B. West Bend's contention that Commercial Union should pay all damages above the $1,000,000 limit is contrary to Oelhafen's holding.*

¶ 11. West Bend contends that it should not be required to pay the next layer of coverage, because when Commercial Union issued the umbrella policy, it only expected there to be $1,000,000 of underlying insurance. Therefore, West Bend reasons that it should not be required to provide an additional $1,000,000 worth of insurance before the umbrella policy's limitations are utilized. This argument was soundly rejected by *Oelhafen*.

¶ 12. In that case, Oelhafen was injured in a boating accident. The boat owners had primary insur-

ance with a limit of $300,000. On top of that, the owners had a $2,000,000 umbrella policy. There were also two boat operators with separate primary policies of $100,000 each issued by different insurance companies. The case was ultimately settled for $925,000. The three primary insurers argued that because the umbrella policy agreed to indemnify any loss over $300,000, the primary insurers should share the first $300,000 of coverage—$100,000 each—and the umbrella policy should be responsible for the remainder of the settlement amount. This court rejected that argument and determined that the umbrella policy was only responsible for the settlement amounts remaining after all the primary insurance policies exhausted their policy limits. We concluded that umbrella policies "are regarded as true excess over and above any type of primary coverage, including excess provisions arising in regular primary policies[.]" *Oelhafen*, 171 Wis. 2d at 539. Thus, we find this argument without merit.

*C. The holding in Oelhafen is on point.*

¶ 13. Next, West Bend argues that the trial court erred in its conclusion that West Bend must provide the next layer of insurance because the *Oelhafen* facts are different from those here and the trial court "overread" the *Oelhafen* case.

¶ 14. Before applying *Oelhafen* to the facts of this case, we pause to emphasize the nature of the differences between primary coverage and umbrella coverage, and the typical escape clauses found within the policies, as this case concerns both types of coverage. Primary insurance policies cover a risk. An umbrella policy is unique and provides special coverage. *Id.* at 538. The umbrella coverage's purpose is different than

that of primary coverage; i.e., it provides the insured with liability coverage in excess of that offered by the primary policy. *Id.* at 538–39; *see also Davis v. Allied Processors, Inc.,* 214 Wis. 2d 294, 299–300, 571 N.W.2d 692 (Ct. App. 1997). This difference was recognized in *Oelhafen*:

> One very important type of coverage in these days of potentially high verdicts is that provided by so-called umbrella or catastrophe policies . . . . [This coverage] gives a financial security, as well as peace of mind, to the individual purchasing such coverage who is hopeful that he will never be involved in any substantial claim or lawsuit, but, if he is, is desirous of not losing the security it may have taken a lifetime to acquire.
>
> . . . .
>
> The courts are not ignorant of [these] desirable socio-economic consequences attendant upon the providing of umbrella or catastrophe coverages.

171 Wis. 2d at 538–39 (quoted source and footnote omitted). Another important difference between umbrella policies and primary policies is that umbrella policies always require underlying insurance: "Both true excess and umbrella policies require the existence of a primary policy as a condition of coverage." LEE R. RUSS & THOMAS F. SEGALLA, 15 COUCH ON INSURANCE § 220:32 (3d ed. 1999) (footnote omitted).

¶ 15. Both types of insurance often contain "other insurance" clauses that attempt to rank the order of policies and limit liability when more than one primary insurance policy exists. *See id.,* § 219:1. "[O]ne category of 'other insurance' provisions is the 'excess clause,' in which the insurer's liability extends only to the amount by which the loss exceeds the coverage of all other valid

and collectible insurance up to the limits of the excess policy." *Schoenecker*, 88 Wis. 2d at 671. A second category "is the 'escape clause,' which provides that there is no coverage when there is other valid and collectible insurance." *Id.* In situations involving the interplay between primary and umbrella coverages, this court should "examine the overall pattern of insurance and . . . construe each policy as a whole." *Oelhafen*, 171 Wis. 2d at 538.

¶ 16. West Bend argues that *Oelhafen*'s facts are distinct from those in operation here. West Bend points out that here, the West Bend policy was purchased for a different primary purpose, i.e., to protect Bieck, not LST. And, unlike *Oelhafen*, where there were three underlying policies disputing primary coverage, Commercial Union concedes that its underlying policy is first in line for payment.

¶ 17. We first address West Bend's argument that since West Bend's policy was intended to cover only Bieck's business, *Oelhafen* is inapplicable. We disagree. We see no reason to reach a conclusion unlike the one in *Oelhafen* simply because West Bend's exposure occurred as a result of its "real estate managed property" endorsement rather than a policy written specifically to cover this risk. So, too, we see no merit in West Bend's contention that because Commercial Union agreed its primary general liability policy should pay the first $1,000,000, *Oelhafen*'s holding is inapplicable. Distilled to its essence, the dispute here, as in *Oelhafen*, concerns the priority of primary and umbrella policies.

¶ 18. Next, West Bend argues that several major differences exist between the *Oelhafen* policies and the policies in this case, making the holding of *Oelhafen* inapposite. West Bend submits that the wording of the umbrella policy in *Oelhafen* was what drove the ulti-

781

mate result, and since the wording here differs significantly from that of the policy in *Oelhafen*, the result should be different. *Oelhafen*'s umbrella policy's "other insurance" clause reads:

> **Other insurance.** Our coverage is excess over any other insurance. This applies whether the other insurance is primary, contributing, excess or contingent. If the other insurance provides coverage only in excess of a stated amount of liability for each accident, we shall pay that part of the Net Loss covered by this policy. In such cases we will pay only our share. Our share is the proportion that our Limit of Coverage bears to the total of all limits of all other excess indemnity policies applicable to the loss.

*Id.* at 536.

¶ 19. The "other insurance" clause found in Commercial Union's umbrella policy reads:

> This insurance is excess over "underlying insurance" or any other valid and collectible insurance (except other insurance purchased specifically to apply in excess of this insurance) which is available to the "insured" covering a loss also covered by this policy.

West Bend submits that the key phrase "except other insurance purchased specifically to apply in excess of this insurance," when read in conjunction with its "real estate property managed" endorsement, turns the West Bend policy into an excess policy over and above the umbrella policy. The endorsement reads in part: "With respect to your liability arising out of your management of property for which you are acting as real estate manager this insurance is excess over any other valid and collectible insurance available to you." Observing that Commercial Union's umbrella policy never lists West Bend's policy as underlying insurance, West Bend

reaches several conclusions. It submits that because the umbrella policy's "other insurance" clause references policies specifically purchased to be excess and the West Bend policy's "real estate managed property" endorsement requires it to be excess, and because the West Bend policy was specifically purchased to be in excess of the umbrella coverage, West Bend's policy comes last in line. We disagree.

¶ 20. First, as noted, the record does not support West Bend's assertion that Bieck purchased West Bend's policy specifically to be in excess of the umbrella policy. Further, by attempting to transform what is essentially a primary policy into an "umbrella" policy by pointing to the "other insurance" clause found in the Commercial Union policy, and coupling it with the wording of the "real estate property managed" endorsement found in the West Bend policy, West Bend has ignored the reasoning behind the *Oelhafen* ruling. As noted, the umbrella policy serves a different function than primary policies—it is the last line of defense—and that is why coverage offered in primary policies is utilized before that found in umbrella policies. *Oelhafen* requires an exhaustion of primary policies before the umbrella policy becomes responsible for any liability. *See* 171 Wis. 2d at 539. Thus, as we have noted, *Oelhafen* declared that umbrella policies stand apart from primary policies, umbrella policies serve a different function than primary policies, and, unlike a primary insurance policy, an "umbrella policy specifically contemplates and, in fact, *requires*" underlying insurance. *Id.* at 538 (emphasis in original).

¶ 21. The West Bend policy purchased here was intended to be a primary policy covering the business and business property. The endorsement for managed

properties has no requirement that underlying insurance exist. Thus, the West Bend policy is not an umbrella policy; rather, it is a primary policy with an excess insurance clause. We also observe that the "real estate managed property" endorsement was honored in this case because the Commercial Union general liability policy paid its policy limit—the first $1,000,000—before coverage was sought from West Bend. Moreover, the phrase "except other insurance purchased specifically to apply in excess of this insurance" references, by implication, additional *umbrella* coverage that may be purchased to sit on top of the Commercial Union umbrella policy. Because West Bend's policy requires no underlying coverage, it is a primary policy and does not qualify under the exception. Despite West Bend's efforts, its policy remains one of primary coverage; it is not an umbrella policy. Thus, it is obligated to pay its limits before the Commercial Union umbrella policy.

¶ 22. Furthermore, in analyzing the policies, the *Oelhafen* court observed that the relatively small premiums charged for umbrella policies, in relation to the risk, supports its conclusion that umbrella policies are last in order of payment. Several reasons are presented for this conclusion:

> We also note that the intent of umbrella policies to serve a different function from primary policies with excess clauses is reflected in the rate structure of the two types of policies. In general, umbrella policy premiums are relatively small in relation to the amount of risk "so that the company cannot be expected to prorate with other excess coverages; and public policy should not demand that this be done."

*Id.* at 539 (quoted source omitted). As re-stated by *Davis*:

[A]n umbrella policy provides special coverage normally not applicable except in the case of a "catastrophic" loss. Therefore, the premium charged for such a policy is substantially lower than for a primary policy.

This stands to reason. Insurance companies charge premiums based upon statistics. Undoubtedly, [the insurance company]'s conclusions were that it was far more likely that payment would be required for compensatory damages under the underlying policy than would be required for a compensatory loss of over $500,000 through the umbrella policy. Because the risk was diminished for the umbrella policy, it could and did charge a smaller premium.

214 Wis. 2d at 300. Here, the premiums charged for the various policies support the *Oelhafen* conclusions. The Commercial Union primary policy premium for $1,000,000 of coverage was $8,986, while the premium charged for its umbrella coverage of $3,000,000 was $2,430 (only $810 per $1,000,000 of coverage). On the other hand, the West Bend policy's premium for its $1,000,000 of coverage was $2,322. Thus, because Commercial Union's umbrella policy coverage is relatively far less costly, Commercial Union's policy satisfies the "premiums charged" test.

¶ 23. Finally, we decline to require *pro rata* sharing of the liability because the policies are not identical. Rather, Commercial Union's policy is an umbrella policy, while West Bend's policy is a primary policy. All primary policy limits must be paid before the umbrella policy's limits are invaded. Thus, for the reasons stated, we affirm.

*By the Court.*—Judgment affirmed.