[855 NYS2d 459]

Bovis Lend Lease LMB, Inc., et al., Respondents, v Great American Insurance Company et al., Respondents, United National Insurance Corp., Appellant-Respondent, and Westchester Fire Insurance Company, Respondent-Appellant, et al., Defendant. (And a Third-Party Action.)

First Department, April 10, 2008

### APPEARANCES OF COUNSEL

*Nicoletti Gonson Spinner & Owen LLP*, New York City (*Edward S. Benson* of counsel), for appellant-respondent.

*Lustig & Brown, LLP*, New York City (*Sherri N. Pavloff* and *Randolph E. Sarnacki* of counsel), for respondent-appellant.

*Newman Fitch Altheim Myers, P.C.*, New York City (*Olivia M. Gross* and *Howard B. Altman* of counsel), for Bovis Lend Lease LMB, Inc. and others, respondents.

*Hoffman & Roth, LLP*, New York City (*James A. Roth* of counsel), for Great American Insurance Company, respondent.

*Rivkin Radler*, Uniondale (*Merril Biscone* of counsel), for Liberty Insurance Underwriters, Inc., respondent.

### OPINION OF THE COURT

Friedman, J.

This appeal concerns a dispute among several insurance companies over the priority of coverage for the construction

manager and owner of a construction project in a wrongful death action. Based on an examination of the terms and role of each insurance policy at issue, we hold that the additional insured coverage afforded the construction manager and owner by the umbrella liability policy of the subcontractor that employed the decedent is excess to the construction manager's and owner's coverage under the construction manager's own primary insurance. We also hold, based on the same examination, that the construction manager's and owner's additional insured coverage under the subcontractor's umbrella policy is excess to their coverage under the primary insurance maintained by the general contractor that retained the subcontractor. We reach these conclusions notwithstanding that the insurance provisions of the underlying subcontract apparently required the subcontractor to make all of the insurance it provided to the construction manager and owner applicable on a primary basis, without contribution by the construction manager's and owner's own insurance. Our reasoning is that, under applicable precedent, an umbrella or excess liability insurance policy should be treated as just that, and not as a second layer of primary coverage, unless the policy's own terms plainly provide for a different result. To hold otherwise would, we believe, merely sow uncertainty in the insurance market.

This matter arises from a fatal accident that occurred on June 10, 2003, in the course of the construction of the Bronx Criminal Court Complex, a project for which Bovis Lend Lease LMB, Inc. (Bovis) was retained as construction manager by the governmental owner, the Dormitory Authority of the State of New York (DASNY). The decedent, Joao Goncalves, was an employee of J & A Concrete Corp. (J & A), a subcontractor of the project's general construction contractor, Stonewall Contracting Corp. (Stonewall). The decedent allegedly fell down an elevator shaft on which work had been performed by A.J. McNulty & Co., Inc. (A.J. McNulty), a subcontractor of SMI-Owen Steel Company, Inc. (SMI-Owen), the structural steel and stair contractor for the project. Stonewall and SMI-Owen each contracted separately with DASNY, and were not in contractual privity with each other.[1]

The decedent's estate has commenced a wrongful death action in Bronx County Supreme Court against, among others,

---

1. Although Bovis was construction manager, the prime contractors (such as Stonewall and SMI-Owen) entered into agreements directly with DASNY, as owner.

DASNY, the City of New York (NYC), Bovis, and Stonewall (*Maria Goncalves, etc., et al. v The Dormitory Authority of the State of New York, et al.*, Index No. 21460/04 [the *Goncalves* action]). The instant action has been brought by plaintiffs herein—Bovis, DASNY, NYC, and Bovis's commercial general liability (CGL) insurance carrier, Illinois National Insurance Company (Illinois)—to obtain a determination concerning the entitlement of Bovis, DASNY and NYC (collectively, the Bovis plaintiffs) to a defense and indemnification in the *Goncalves* action from the insurers of Stonewall, J & A and A.J. McNulty. The following insurers (with relevant policy limits noted) have been named as direct defendants in this action: (1) QBE Insurance Corporation (QBE), J & A's primary CGL carrier (policy limit of $1 million per occurrence); (2) United National Insurance Corp. (United), J & A's commercial umbrella liability carrier (policy limit of $5 million per occurrence, in excess of primary coverage); (3) Liberty Insurance Underwriters, Inc. (Liberty), Stonewall's primary CGL carrier (policy limit of $1 million per occurrence); (4) Westchester Fire Insurance Company (Westchester), Stonewall's commercial umbrella liability carrier (policy limit of $10 million per occurrence, in excess of primary coverage); and (5) Great American E & S Insurance Company, sued herein as Great American Insurance Company (Great American), A.J. McNulty's primary CGL carrier (policy limit of $1 million per occurrence). The relevant limit of the Bovis plaintiffs' primary CGL coverage under the policy issued to Bovis by plaintiff Illinois (which covers DASNY and NYC as additional insureds) is $1 million per occurrence.[2]

After the commencement of this action, QBE agreed to defend and indemnify the Bovis plaintiffs as additional insureds under J & A's primary policy, up to that policy's $1 million per-occurrence limit. The Bovis plaintiffs' status as additional insureds under the United, Liberty and Westchester policies is also undisputed.[3] Still in dispute, however, is what the priority of coverage will be, upon exhaustion of the QBE policy, among the remaining defendants, as well as plaintiff insurer Illinois.

---

**2.** United has commenced a third-party action seeking declaratory relief against two additional insurers, J & A's workers' compensation carrier and the CGL carrier of H.J. Russell & Company, one of the contractors sued in the *Goncalves* action. The obligations of the third-party defendants, if any, are not at issue on this appeal.

**3.** As more fully discussed toward the end of this decision, it cannot be determined on the existing record whether, for purposes of the *Goncalves* action, the Bovis plaintiffs are additional insureds under A.J. McNulty's Great American policy.

On opposing motions for summary judgment by plaintiffs, United and Liberty, Supreme Court declared, in substance, that the order of coverage for the Bovis plaintiffs, after exhaustion of the QBE policy, would be United first, Liberty second, Westchester third, and Illinois fourth. On United's appeal and Westchester's cross appeal, we modify to declare that the order of coverage for the Bovis plaintiffs after QBE is Liberty first, Illinois second, and, third, United and Westchester, sharing ratably.

Supreme Court apparently adopted the view of plaintiffs and Liberty that the priority of coverage among the subject policies is dictated by the terms of the underlying trade contracts (i.e., the DASNY/Stonewall contract and the Stonewall/J & A subcontract), even if an examination of the terms of the various insurance policies would yield a different result. The trade contracts required Stonewall and J & A to obtain $5 million of "additional insured" coverage for the Bovis plaintiffs that would be "primary to any other insurance maintained by the [Bovis plaintiffs]," and to which the Bovis plaintiffs' own insurance would be excess.[4] Accordingly, Supreme Court deemed the Bovis

---

4. Under its subcontract with Stonewall, J & A was obligated to obtain insurance meeting the requirements of Stonewall's contract with DASNY, which were, in relevant part:

"Commercial General Liability (CGL) with a combined single limit for Bodily Injury, Personal Injury and Property Damage of at least $5,000,000 per occurrence & aggregate. The limit may be provided through a combination of primary and umbrella/excess liability policies.

"Coverage shall provide and encompass at least the following:

"a. Written on an occurrence form;

"b. Endorsement naming [Bovis, DASNY and NYC, inter alia] as additional insured's [sic] . . .

"c. Policy or policies must be endorsed to be primary as respects the coverage afforded the Additional Insureds and such policy shall be primary to any other insurance maintained by the OWNER or any other additional insured. Any other insurance maintained by the OWNER shall be excess of and shall not contribute with the Contractor's or Subcontractor's insurance, regardless of the 'other insurance' clause . . . ."

In addition, a separate rider to the Stonewall/J & A subcontract required J & A to obtain CGL coverage with "Additional Insured's [sic] to be included on a primary basis," and contained the following provision: "Insurance policies shall be endorsed to name owner [sic] and Contractor as additional insured's [sic], and shall stipulate that this insurance is primary, that any other insurance or self-insurance maintained by Owner and Contractor shall be excess only and shall not be called upon to contribute with this insurance." As more fully discussed below, United and Liberty dispute how much CGL coverage J

*(n. cont'd)*

plaintiffs' additional insured coverage under J & A's United umbrella policy to be triggered immediately upon exhaustion of the $1 million limit of J & A's underlying QBE policy, before the coverage under either of Stonewall's policies or under Bovis's own policy. This is a mistaken approach.

An insurance policy is a contract between the insurer and the insured. Thus, the extent of coverage (including a given policy's priority vis-à-vis other policies) is controlled by the relevant policy terms, not by the terms of the underlying trade contract that required the named insured to purchase coverage. As the Court of Appeals has stated, New York law "recognize[s] the right of each insurer to rely upon the terms of its own contract with its insured" (*State Farm Fire & Cas. Co. v LiMauro*, 65 NY2d 369, 373 [1985]; *see also United States Liab. Ins. Co. v Mountain Val. Indem. Co.*, 371 F Supp 2d 554, 558 [SD NY 2005] ["insurance policy provisions take precedence over conflicting provisions found in contracts between insureds"]; *Travelers Indem. Co. v American & Foreign Ins. Co.*, 286 AD2d 626 [2001] ["it is the policy provisions that control (priority of coverage) and not the provisions of the subcontract" between the insureds]; *United States Fid. & Guar. Co. v CNA Ins. Cos.*, 208 AD2d 1163, 1165 [1994] ["the terms of both policies clearly and unequivocally provide for equal contribution towards the defense and indemnification of (the additional insured), and we are not at liberty to rewrite them to conform to the terms of a contract to which the insurance companies were not parties"]).

Contrary to the contentions of plaintiffs and Liberty, *Pecker Iron Works of N.Y. v Traveler's Ins. Co.* (99 NY2d 391 [2003]) is not to the contrary. We recognize, of course, that *Pecker* looked to the underlying subcontract's insurance procurement provisions to determine whether the general contractor's coverage as an additional insured under the subcontractor's policy was primary or excess. The critical point, however, is that the Court of Appeals looked to the subcontract because the insurance policy itself expressly provided that the terms of the subcontract would determine whether the additional insured coverage afforded was primary or excess (*see id.* at 393 [subcontractor's policy provided that coverage for additional insureds would be excess unless the subcontractor "agreed in a written contract for this insurance to apply on a primary or contributory basis"]). The controlling nature of the policy terms is made explicit by one of

---

& A was contractually obligated to obtain for Stonewall (as opposed to Bovis, DASNY and NYC).

*Pecker*'s concluding sentences: *"Pursuant to the policy provision at issue,* Travelers agreed to provide primary insurance to any party with whom [the subcontractor] had contracted in writing for insurance to apply on a primary basis" (*id.* at 394 [emphasis added]).

In view of the foregoing, J & A's subcontract is determinative of the priority of the coverage afforded to additional insureds under J & A's United umbrella policy only if the United policy, like the policy of the *Pecker* subcontractor, contains a provision defining the priority of the coverage provided to additional insureds by reference to the requirements of the subcontract. Accordingly, we turn to the United policy to see whether it contains any such provision.

The United policy is denominated a "Commercial Umbrella Liability Policy." The policy requires United to "pay on behalf of the insured that portion of the 'ultimate net loss' in excess of the 'retained limit' because of 'bodily injury' or 'property damage' to which this insurance applies." As pertinent here, the United policy (paragraph 20 of "SECTION VI—DEFINITIONS") defines the term "retained limit" to mean the amount applicable to the claim from the "[u]nderlying insurance" (in this case, the primary CGL policy issued to J & A by QBE) and "[o]ther collectible primary insurance."

The United policy further provides (under paragraph 2 of "SECTION III—WHO IS AN INSURED") that "each of the following is also an insured":

> "e. Any person or organization qualifying as an insured under any policy of 'underlying insurance'. Coverage afforded such insureds under this policy applies only to injury or damage:
>
> "(1) Which is covered by this policy; and
>
> "(2) Which is covered by the 'underlying insurance' or would be covered but for the exhaustion of such policy's limits of insurance.
>
> "This policy does not afford such person or organization limits of insurance in excess of the lesser of:
>
> "(1) The minimum limit of insurance you agreed to provide; or
>
> "(2) The limit of insurance under this policy.
>
> "f. Any person or organization for whom you have

agreed in writing prior to any 'occurrence' or 'offense' to provide insurance such as is afforded by this policy, but only with respect to operations performed by you or on your behalf, or facilities owned or used by you. This policy does not afford such person or organization limits of insurance in excess of the lesser of:

"(1) The minimum limit of insurance you agreed to provide; or

"(2) The limit of insurance under this policy."

The United policy's "Other Insurance" clause (paragraph 10 of "SECTION V—CONDITIONS") provides in pertinent part:

"If other valid and collectible insurance is available to the insured for 'ultimate net loss' we cover under this policy, our obligations under this policy are limited as follows:

"a. As this insurance is excess over any other insurance, whether primary, excess, contingent or on any other basis, except such insurance as is specifically purchased to apply in excess of this policy's Limit of Insurance, we will pay only our share of the amount of 'ultimate net loss', if any, that exceeds the sum of:

"(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

"(2) The total of all deductible and self-insured amounts under this or any other insurance."

Nowhere do the foregoing provisions of the United policy define the priority of the coverage afforded to additional insureds by reference to the requirements of the underlying trade contract requiring J & A (the named insured) to provide such insurance.[5] Accordingly, we must review and consider all of the relevant policies at issue to determine the priority of coverage

---

**5.** While the provisions of the United policy creating additional insured coverage state that such coverage will not exceed "[t]he minimum limit of insurance you agreed to provide," the quoted phrase cannot reasonably be construed as a reference to priority of coverage. Even if the phrase could somehow be so construed, the statement that coverage is not being afforded "in excess of . . . [t]he minimum limit of insurance" the named insured agreed to provide plainly does not mean that coverage is being provided up to that limit.

among them (*see BP A.C. Corp. v One Beacon Ins. Group*, 8 NY3d 708, 716 [2007]). This determination "turns on consideration of the purpose each policy was intended to serve as evidenced by both its stated coverage and the premium paid for it, as well as upon the wording of its provision concerning excess insurance" (*LiMauro*, 65 NY2d at 374 [citations omitted]).

An umbrella insurance policy provides the insured with "final tier . . . coverage at a premium reduced to reflect the lesser risk to the insurer" (*LiMauro*, 65 NY2d at 375). "[U]mbrella coverages . . . are regarded as true excess over and above any type of primary coverage, excess provisions arising in regular policies in any manner, or escape clauses" (8A Appleman on Insurance § 4909.85, at 453-454 [1981] [footnotes omitted]; *see also* 15 Couch on Insurance 3d § 220:41; *see also United States Fire Ins. Co. v CNA*, 300 AD2d 1054 [2002]; *Travelers Indem. Co. v American & Foreign Ins. Co.*, 286 AD2d at 626). Thus, for example, in the context of automobile insurance, an umbrella policy is held to be excess to a primary policy covering the driver or lessee when operating a vehicle not owned by the insured, even if the primary policy states that its coverage for nonowned vehicles is excess (*see Jefferson Ins. Co. of N.Y. v Travelers Indem. Co.*, 92 NY2d 363, 372 [1998]; *LiMauro*, 65 NY2d at 371; *Lumbermens Mut. Cas. Co. v Allstate Ins. Co.*, 51 NY2d 651 [1980]; *Liberty Mut. Ins. Co. v Hartford Ins. Co. of Midwest*, 25 AD3d 658, 662-663 [2006]; *Northbrook Excess & Surplus Ins. Co. v Chubb Group of Ins. Cos.*, 113 AD2d 319 [1985], *affd* 67 NY2d 1015 [1986]). The intent to provide a final tier of coverage may be made explicit by an "Other Insurance" clause providing that coverage under the umbrella policy will be "in excess of all other coverage available, including excess coverage" (*Lumbermens*, 51 NY2d at 656).

Here, as previously noted, J & A's United policy is denominated a "Commercial Umbrella Liability Policy," and its coverage is limited to losses in excess of the coverage afforded by the "[u]nderlying insurance" (the QBE policy) or "[o]ther collectible primary insurance." Further, the United policy's "Other Insurance" clause specifically provides that United's coverage "is excess over any other insurance, whether primary, *excess*, contingent or on any other basis, except such insurance as is specifically purchased to apply in excess of this policy's Limit of Insurance" (emphasis added), thereby "negat[ing] any intention to contribute with other policies except such as were purchased as excess over its excess insurance" (*LiMauro*, 65

NY2d at 377). Moreover, the policy premium ($79,835) was quite modest in comparison with the aggregate amount of potential coverage purchased ($10 million).[6] By comparison, the premium for J & A's primary CGL policy from QBE, with an aggregate policy limit of $3 million ($2 million "General Aggregate Limit" plus $1 million "Products/Completed Operations Aggregate Limit"), was $240,414, about three times the amount of the United premium. Thus, the United policy plainly was intended to constitute the final tier of insurance for any liability it would cover, but for any insurance specifically purchased to apply in excess of its limits.

We now turn to the Liberty policy, the primary CGL policy of Stonewall, the general construction contractor that subcontracted the project's concrete work to J & A. The Liberty policy's "Other Insurance" clause provides, in pertinent part, that the insurance afforded by the policy is "excess over . . . [a]ny other *primary* insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement" (emphasis added). Although the Bovis plaintiffs are additional insureds under the United policy, the United policy is not *primary* insurance and, therefore, it is not subordinated to the Liberty policy by the latter's above-quoted "Other Insurance" clause. Indeed, Liberty does not contend otherwise.

In arguing that its coverage should be deemed excess to the coverage under the United policy, Liberty relies, not on its policy's "Other Insurance" clause, but on a "Special Conditions for Subcontractors Endorsement" (the Subcontractors Endorsement) attached to the policy. That endorsement amends the conditions of the Liberty policy to include, inter alia, the following provision: "Commercial General Liability coverage maintained by subcontractors [of Stonewall] shall be primary and this policy shall be excess of limits of liability of such insurance, not withstanding [*sic*] the language of the Other Insurance provisions of this policy." United and Liberty dispute whether the term "Commercial General Liability coverage maintained by subcontractors" in the Subcontractors Endorsement can be

---

6. Under paragraph 2 of "SECTION IV—LIMITS OF INSURANCE" of the United policy (as amended by endorsement), the $5 million "Policy Aggregate Limit" and the $5 million "Products-Completed Operations Aggregate Limit" set forth in the Declarations apparently do not count against each other.

construed to refer to the "Commercial Umbrella Liability Policy" United issued to J & A. We agree with United that the term should not be so construed.

As exemplified by the *LiMauro* decision, the Court of Appeals' approach to the interpretation of excess clauses is to construe such a clause in a policy otherwise providing primary coverage as addressed to insurance on the same level, not to higher levels of insurance, in order to avoid "distort[ing] the meaning of the terms of the policies involved" (65 NY2d at 374, citing *Lumbermens*, 51 NY2d at 655). Here, to reiterate, it is undisputed that the Liberty policy is not a true excess policy, but a primary policy that, under certain circumstances, purports to shift losses to other available insurance. Further, the Subcontractors Endorsement to the policy does not expressly refer to excess and umbrella coverage. We therefore construe the term "Commercial General Liability coverage maintained by subcontractors" in the Subcontractors Endorsement to refer to the primary CGL policies of Stonewall's subcontractors, not to a true excess policy that, like the United umbrella policy, happens to cover excess CGL risks.[7]

We note that the Liberty policy's status as primary insurance is underscored by the fact that the premium Stonewall paid for it ($225,000 for $10 million "Policy Aggregate" limit) was almost three times the amount of the premium J & A paid for the same aggregate coverage under the United umbrella policy ($79,835 for $10 million aggregate coverage). It is also noteworthy that the Liberty policy incorporates a "Primary Insurance Clause Endorsement," which provides: "To the extent that this insurance is afforded to any additional insured under the policy, such insurance shall apply as primary and not contributing with any insurance carried by such additional insured, as required by written contract." No such endorsement is attached to the United policy.

Our holding that subcontractor J & A's umbrella policy is excess to general contractor Stonewall's primary policy is consistent with the Fourth Department's decision in *Cheektowaga*

---

7. We note that the Subcontractors Endorsement to the Liberty policy does not expressly refer to subcontractors' excess and umbrella coverage. Since the Subcontractors Endorsement does not make express reference to excess and umbrella coverage, we need not consider what the priority of coverage between the Liberty and United policies would have been had the Liberty policy expressly provided that it was excess to any coverage afforded the insured by subcontractors' excess and umbrella policies.

*Cent. School Dist. v Burlington Ins. Co.* (32 AD3d 1265 [2006]). In *Cheektowaga*, the issue was the priority of coverage for the plaintiffs (the owner and the construction manager of a project) between the construction manager's primary policy (from Zurich) and the roofing contractor's umbrella policy (from Diamond State). The owner and construction manager were covered by the Diamond State policy as additional insureds (*id.* at 1266). As summarized by the court, the Zurich policy, although generally primary, provided that its coverage would be excess if "there was other primary insurance available for which plaintiffs were added as additional insureds by the attachment of an endorsement or there was other insurance, *whether primary or excess*, in which a named insured of the Zurich policy was added as an additional insured" (*id.* at 1267 [emphasis added]). Notwithstanding this excess clause in the construction manager's Zurich policy, the court held that the roofing contractor's Diamond State umbrella policy was excess to the Zurich policy. The court explained:

> "Sahlem [the roofing contractor] paid $43,750 for $10,000,000 in umbrella coverage under the Diamond State policy, whereas Ciminelli [the construction manager] paid $414,277 for $1,000,000 in general liability coverage under the Zurich policy. In addition, . . . the Diamond State policy is an umbrella policy and its coverage is excess to other insurance, providing coverage only after the exhaustion of other excess policies, while the Zurich policy affords primary coverage. Because the Zurich policy was purchased for primary coverage, despite its 'other insurance' clause whereby it would provide only excess coverage under certain conditions, and the Diamond State policy was purchased only for excess coverage, the Diamond State policy is 'last on the risk' " (*id.* at 1268 [citations and some internal quotation marks omitted]).

Liberty also argues that its policy should be deemed excess to the United policy based on the provision of the United "Other Insurance" clause that "this insurance is excess over any other insurance . . . *except such insurance as is specifically purchased to apply in excess of this policy's Limit of Insurance*" (emphasis added). This argument is without merit. Liberty does not identify in the policy it issued to Stonewall any specific refer-

ence to J & A's United policy or to the latter policy's particular limit of insurance, much less anything indicating that the Liberty policy was "specifically purchased to apply in excess" of the United policy, in particular. We agree with those courts that have held that a reference in an insurance policy to insurance "specifically purchased to apply in excess" of the subject policy (or similar phraseology) means a higher-level policy that specifically designates the subject policy as underlying insurance (see *National Farmers Union Prop. & Cas. Co. v Farm & City Ins. Co.*, 689 NW2d 619, 623 [SD 2004]; *Treder ex rel. Weigel v LST, Ltd. Partnership*, 271 Wis 2d 771, 784, 679 NW2d 555, 561 [Ct App 2004], *review denied* 273 Wis 2d 656, 684 NW2d 137 [2004]; *Allstate Ins. Co. v Frank B. Hall & Co. of Cal.*, 770 P2d 1342, 1347 [Colo App 1989]).[8]

Having established that the United policy is excess to the Liberty policy with regard to the duty to defend and indemnify the Bovis plaintiffs, we turn to the Illinois policy issued to Bovis, the construction manager.[9] The "Other Insurance" clause of the CGL coverage form incorporated by the Illinois policy has been amended by endorsement to provide in pertinent part:

> "This insurance is excess over any of the other insurance whether primary, excess, contingent or on any other basis:
>
> "(1) Unless such insurance is specifically purchased to apply as excess of this policy, or
>
> "(2) *you* [Bovis] *are obligated by contract to provide primary insurance*" (emphasis added).

Plaintiffs deny that the Illinois policy constitutes primary insurance for purposes of the *Goncalves* action under the above-quoted provision. We disagree. The construction management agreement between DASNY and Bovis for the Bronx Criminal Court Complex project plainly required Bovis, as construction manager (and not just the downstream contractors and subcontractors, such as Stonewall and J & A), to obtain and maintain *primary* CGL insurance covering DASNY and NYC as

---

**8.** Since the United policy is an umbrella policy, it follows that the phrase "such insurance as is specifically purchased to apply in excess of this policy's Limit of Insurance" is employed in the United policy's "Other Insurance" clause to refer to a *second* level of excess insurance, if one exists, above the United policy itself.

**9.** Liberty concedes that the Illinois policy is excess to Liberty's coverage of the Bovis plaintiffs, a point not disputed by any of the other parties.

additional insureds.[10] Since the Illinois policy provides that its coverage is primary if Bovis is "obligated by contract to provide primary insurance," the Illinois policy—by its own terms—provides primary coverage for claims arising from the construction of the Bronx Criminal Court Complex. Given the primary coverage afforded by the Illinois policy in this context, it follows that the United policy—which, again, is an umbrella policy providing a secondary level of coverage in exchange for a relatively small premium—is excess to the Illinois policy for purposes of the *Goncalves* action.[11]

Plaintiffs and Liberty argue that, in holding the Bovis plaintiffs' coverage as additional insureds under the United umbrella policy to be excess to their coverage under the Liberty and Illinois policies, we run afoul of the principle that an additional insured "enjoy[s] the same protection as the named

---

**10.** The DASNY/Bovis contract provides in pertinent part:

"ARTICLE VIII: INSURANCE PROVIDED BY CONSTRUCTION MANAGER

"A. CONSTRUCTION MANAGER [Bovis] shall procure and shall maintain all the insurance required under this Article until Final Acceptance of all the Work. . . . The CONSTRUCTION MANAGER and each of its Subcontractors of every tier shall provide insurance as follows: . . .

"3. Commercial General Liability (CGL) with a combined single limit for Bodily Injury, Personal Injury and Property Damage of at least $5,000,000 per occurrence and aggregate. The limit may be provided through a combination of primary and umbrella/excess policies. Coverage shall provide and encompass at least the following: . . .

"f. Endorsement naming The City of New York, Dormitory Authority—State of New York and Bronx County Criminal Court Complex as Additional Insureds;

"g. Policy or policies must be endorsed to be primary as respects the coverage afforded the Additional Insureds and such policy shall be primary to any other insurance maintained by the OWNER [DASNY]. Any other insurance maintained by the Owner shall be excess of and shall not contribute with the CONSTRUCTION MANAGER'S, its Contractor's or Subcontractor's insurance, regardless of the 'other insurance' clause contained in the OWNER'S own policy of insurance."

**11.** The primary nature of the Illinois policy is confirmed by the substantial premium Bovis paid for it, namely, $409,500 (about five times the amount of the premium for the United umbrella policy) for $6 million aggregate potential coverage ($3 million "General Aggregate Limit" plus $3 million "Products-Completed Operations Aggregate Limit"). It should be noted that the Illinois policy did not cover all of the billions of dollars worth of operations Bovis states that it conducts around the world. Rather, an endorsement to the Illinois policy provided that the policy applied only to losses arising out of the Bronx Criminal Court Complex construction project.

insured" (*BP A.C. Corp.*, 8 NY3d at 715, quoting *Pecker*, 99 NY2d at 393). Pointing out that United's coverage of its named insured (J & A) would be triggered immediately upon exhaustion of the underlying QBE policy, plaintiffs and Liberty contend that delaying the trigger of the Bovis plaintiffs' coverage until the Liberty and Illinois policies have been exhausted as well affords the additional insureds less protection than the named insured. This argument ignores the fact that the Bovis plaintiffs have more primary insurance available to them—$2 million more, in fact—than does J & A. Given the Bovis plaintiffs' greater amount of primary coverage, it is the application of the plain terms of the United policy—the same terms that govern the named insured's coverage—that results in the later trigger of the Bovis plaintiffs' coverage.

It is possible, of course, for an insurance policy to provide that additional insureds will enjoy greater protection than the named insured. Indeed, the aforementioned "Primary Insurance Clause Endorsement" to the Liberty policy (providing that coverage for an additional insured "shall apply as primary and not contributing with any insurance carried by such additional insured") apparently constitutes such a provision. The United policy, however, contains no such provision.

An additional line of argument by plaintiffs is also unavailing. After the conclusion of the *Goncalves* action, it may (or may not) ultimately turn out, as plaintiffs posit, that Illinois, on account of its payment of its share of the costs of defending and indemnifying its insureds in the *Goncalves* action, will become subrogated to a claim by those insureds for contractual indemnification from J & A, and that J & A will ultimately be entitled to indemnification for its liability on that claim under the coverage for contractual liability afforded by J & A's United policy.[12] Further, should a judgment for such indemnification eventually be entered in favor of Illinois against J & A, and remain unsatisfied for 30 days, Illinois will be entitled to bring a direct action against United to recover any contractual liability coverage available to J & A under its United policy (*see* Insurance Law § 3420 [a] [2]; [b] [2]; *Northland Assoc. v Joseph Baldwin Constr. Co.* [appeal No. 2], 6 AD3d 1214, 1216 [2004]). The possibility of this scenario playing out in the long run does

---

**12.** As plaintiffs point out, a subcontractor on a construction project usually agrees to indemnify the general contractor and the owner for liabilities arising out of the subcontractor's work, including any liability for the injury or death of an employee of the subcontractor.

not, however, have the effect, at this stage, of negating the priority of coverage among the applicable policies arising from the terms of those policies (*see Harleysville Ins. Co. v Travelers Ins. Co.*, 38 AD3d 1364, 1367 [2007], *lv denied* 9 NY3d 811 [2007]; *United States Fid. & Guar. Co. v CNA Ins. Cos.*, 208 AD2d at 1165). The rights and obligations of the insurers are governed by their respective insurance policies, not by the underlying trade contracts among the insureds.[13]

At this point in our analysis, we have ascertained that the order of coverage of the Bovis plaintiffs, after exhaustion of the QBE policy, will be Liberty, Illinois, and United, in that order. We further conclude, based on the policy provisions set forth below, that Stonewall's umbrella policy from Westchester will share the Bovis plaintiffs' loss with United, J & A's umbrella carrier, on a pro rata basis after the exhaustion of the Illinois policy.

The Westchester policy, like the United policy, is denominated an "umbrella" policy, and provides coverage only for losses "in excess of the 'Retained Limit,'" the latter term being defined, in pertinent part, to mean "the total of the applicable limits of the 'Underlying Insurance' [as here relevant, the Liberty policy] plus the applicable limits of any other insurance." The Westchester policy's "Other Insurance" clause provides:

> "**H. Other Insurance**. If there is any other collectible insurance available to the 'insured' (whether such insurance is stated to be primary, contributing, excess or contingent) that covers a loss that is also covered by this policy, the insurance provided by this policy will apply in excess of, and shall not contribute with, such insurance. This Condition H does not apply to any insurance policy purchased specifically (and which is so specified in such insurance policy) to apply in excess of this policy."

The foregoing policy provisions make it plain that the Westchester policy, like the United policy, was intended to be true excess insurance. Since United and Westchester "both hav[e]

---

**13.** Also without merit is plaintiffs' argument that the antisubrogation rule somehow bars United's effort to vindicate the excess nature of its policy (*see Jefferson Ins. Co. of N.Y. v Travelers Indem Co.*, 92 NY2d at 374-375; *Liberty Mut. Ins. Co. v Insurance Co. of State of Pa.*, 43 AD3d 666, 667 [2007]). After all, United's position is not based on a claim to be subrogated to J & A's rights, but on the priority of coverage established by the terms of the relevant insurance policies.

contracted to cover the same risk on the same level," and have employed essentially mirror-image excess clauses in the "Other Insurance" provisions of their respective policies, "the excess coverage clauses are deemed to cancel each other out and each carrier is required to contribute ratably in such proportion as its policy limit bears to the total of all policy limits [at the same level]" (*LiMauro*, 65 NY2d at 373-374).

What emerges is that, among the Liberty, Illinois, United and Westchester policies, the order of coverage of the Bovis plaintiffs in the *Goncalves* action, after exhaustion of the QBE policy's $1 million per-occurrence limit, will be: (1) Liberty (up to its $1 million per-occurrence limit); (2) Illinois (up to its $1 million per-occurrence limit); and (3) United and Westchester, sharing ratably, each up to the limit of its coverage.[14]

In addition to ruling on the priority of coverage for the Bovis plaintiffs, Supreme Court granted Liberty summary judgment declaring that the order of coverage for Liberty's named insured, Stonewall (which is not covered by the Illinois policy), would be QBE first (as QBE agreed), United second, and Liberty third. (It is undisputed that Westchester's umbrella coverage of Stonewall is triggered upon the exhaustion of Liberty's primary coverage.) We find that this aspect of the order appealed from must be modified to provide that the order of Stonewall's coverage, after exhaustion of the QBE policy, is Liberty and then, upon exhaustion of Liberty's coverage, Westchester, without contribution by United at any stage.

Notwithstanding that Stonewall falls within the definition of an "insured" under the above-quoted provisions of the United policy that afford the Bovis plaintiffs coverage ("SECTION III—WHO IS AN INSURED," para 2, subparas [e], [f]), those provisions, as previously noted, provide that an additional insured is not afforded coverage "in excess of . . . [t]he minimum limit of insurance you [the named insured] agreed to

---

**14.** With regard to the United policy, we note that, although the monetary limit of insurance set forth in that policy is $5 million, it is undisputed that the actual limit of insurance for the Bovis plaintiffs in the *Goncalves* action will be $4 million. This is because the United policy provides that additional insureds are not afforded coverage "in excess of . . . [t]he minimum limit of insurance you [the named insured] agreed to provide" ("SECTION III—WHO IS AN INSURED," para 2, subparas [e], [f]). Since J & A's subcontract required it to provide the Bovis plaintiffs with $5 million of coverage, and the first $1 million of such coverage is being provided by the QBE primary policy, the maximum coverage afforded the Bovis plaintiffs by the United umbrella policy is $4 million.

provide." Here, contrary to Liberty's arguments, J & A, United's named insured, did not agree to provide Stonewall with CGL coverage having a per-occurrence limit of $5 million. The insurance requirements of the DASNY/Stonewall contract (footnote 4, *supra*), which were incorporated into the Stonewall/J & A subcontract, did not include any mandate that Stonewall's subcontractors obtain coverage for *Stonewall*, as opposed to Bovis, DASNY and NYC. While the Stonewall/J & A subcontract contained a separate provision requiring J & A to obtain insurance covering Stonewall, this provision required J & A to obtain CGL coverage for Stonewall with a per-occurrence limit of only $1 million. The QBE primary policy satisfies this limit by itself. Since the United policy does not afford additional insureds greater coverage than J & A was contractually obligated to provide, United does not owe Stonewall any coverage in connection with the *Goncalves* action.[15]

As previously noted, one of the defendants in this declaratory judgment action is Great American, the primary CGL carrier of A.J. McNulty, a subcontractor that allegedly performed work on the elevator shaft where the accident occurred. A.J. McNulty (which, it should be remembered, was not the decedent's employer) has not been named as a defendant in the *Goncalves* action (although the Bovis plaintiffs and Stonewall have commenced a third-party action against it therein). At this point, no determination has been made as to whether A.J. McNulty bears any responsibility for the accident. Nonetheless, in its summary judgment motion, United sought a determination of the priority of Great American's coverage, if any, of the Bovis plaintiffs in the *Goncalves* action. United argued that Supreme Court should declare that the Bovis plaintiffs' coverage under the United umbrella policy will not be triggered until their coverage (if any) under the Great American policy, as well as the coverage

---

**15.** Liberty relies on a provision of the Stonewall/J & A subcontract providing as follows: "Higher limits required depending upon particulars of each specific contract might be obtained. The above limits may be written by combination of CGL & Umbrella policies." This provision (which Stonewall drafted) is so vague and ambiguous that one can only speculate as to what it means. To the extent the provision may have been intended to provide that Stonewall might in some cases require a subcontractor to obtain greater coverage for Stonewall than the requirements previously set forth in the printed form, Liberty does not point to any record evidence that J & A ever actually agreed to any such higher insurance requirements in connection with the project at issue. Neither United nor Liberty argues that extrinsic evidence should be considered to resolve the ambiguity of the contractual language in question.

under the Liberty and Illinois policies, has been exhausted. The court denied such relief.

On this record, Supreme Court correctly declined to render any declaration concerning the priority of Great American's coverage of the Bovis plaintiffs, if any, in the *Goncalves* action. As United itself concedes, "whether any of the [Bovis plaintiffs] are additional insureds under the Great American policy has not been determined." Again, the *Goncalves* decedent was not employed either by A.J. McNulty (Great American's named insured) or by any subcontractor of A.J. McNulty. Thus, under the terms of the Great American policy's additional insured provision, whether the Bovis plaintiffs are additional insureds under the Great American policy for purposes of the *Goncalves* action depends on its being proven, or (for purposes of the duty to defend) alleged in the *Goncalves* complaint, that liability for the accident somehow otherwise "aris[es] out of [A.J. McNulty's] ongoing operations for" the Bovis plaintiffs before such "operations . . . [were] completed." The complaint in the *Goncalves* action, however, does not name A.J. McNulty as a defendant, does not allege that the accident was the result of any fault on the part of A.J. McNulty, and does not allege that the accident occurred while A.J. McNulty's work was ongoing at the site. Accordingly, at this stage, the Bovis plaintiffs cannot be said to be additional insureds under the Great American policy for purposes of the *Goncalves* action. It would be inappropriate to render an advisory opinion concerning where Great American would fit into the order of coverage for the *Goncalves* action in the hypothetical event it is determined that the Great American policy affords the Bovis plaintiffs coverage for that lawsuit.[16]

Westchester, Stonewall's umbrella carrier, argues that it was premature for Supreme Court to render any determination concerning the priority of coverage among any of the policies at issue in this action. In support of this position, Westchester points out that, on the existing record, it cannot be determined whether, and to what extent, Great American (as A.J. McNulty's carrier) and the insurers of other contractors being sued in the *Goncalves* action have defense and indemnity obligations to the

---

**16.** It should also be noted that, although the Great American policy extends additional insured coverage (under appropriate circumstances) to any organization that A.J. McNulty "agreed in writing . . . [to] add[ ] as an additional insured on [A.J. McNulty's] policy," the agreement between A.J. McNulty and its general contractor in the project, SMI-Owen, is not included in the record.

Bovis plaintiffs under the additional insured provisions of their respective policies. This argument is without merit. Regardless of the uncertainty as to the responsibility of insurers for other contractors, the priority of coverage for the Bovis plaintiffs among Liberty, Illinois, United and Westchester can be determined on the existing record. Apart from the question of priority of coverage, there is no dispute as to the Bovis plaintiffs' entitlement to defense and indemnification in the *Goncalves* action from each of these four insurers. All of the insurance policies and trade contracts relevant to the insurers' obligations to the Bovis plaintiffs are in the record. That other insurers may subsequently be found to have obligations to the Bovis plaintiffs in this matter is not a reason to delay adjudicating the priority of coverage, inter se, among Liberty, Illinois, United and Westchester (*see Continental Cas. Co. v Rapid-American Corp.*, 80 NY2d 640, 655-656 [1993]).

Accordingly, the order of the Supreme Court, New York County (Carol Edmead, J.), entered April 6, 2006, which granted summary judgment motions by plaintiffs and Liberty, and denied a summary judgment motion by United, to the extent of declaring, in effect, that the order of the obligation to defend and indemnify Bovis, DASNY, NYC, and Stonewall in an underlying wrongful death action entitled *Maria Goncalves, etc., et al. v The Dormitory Authority of the State of New York, et al.*, Bronx County Clerk's Index No. 21460/04, is (1) QBE, up to the $1 million limit of its coverage, (2) upon exhaustion of QBE's coverage, United, up to the $4 million limit of its coverage, (3) upon exhaustion of QBE's and United's coverage, Liberty, up to the $1 million limit of its coverage, and (4) upon exhaustion of QBE's, United's and Liberty's coverage, Westchester, up to the $10 million limit of its liability, should be modified, on the law, (a) to declare that, upon the exhaustion of QBE's coverage, the order of the obligation to defend and indemnify Bovis, DASNY and NYC in the aforesaid underlying wrongful death action is (1) Liberty, up to the $1 million limit of its coverage, (2) upon exhaustion of QBE's and Liberty's coverage, Illinois, up to the $1 million limit of its coverage, and (3) upon exhaustion of QBE's, Liberty's and Illinois' coverage, United and Westchester, sharing on a pro rata basis, up to the respective limits of their policies, and (b) to declare further that, upon exhaustion of QBE's coverage, the order of the obligation to defend and indemnify Stonewall in the aforesaid underlying wrongful death action is (1) Liberty, up to the $1 million limit of its coverage,

and (2) upon exhaustion of QBE's and Liberty's coverage, Westchester, up to the $10 million limit of its coverage, and otherwise affirmed, without costs.

Tom, J.P., Gonzalez and Kavanagh, JJ., concur.

Order, Supreme Court, New York County, entered April 6, 2006, modified, on the law, (a) to declare that, upon the exhaustion of QBE's coverage, the order of the obligation to defend and indemnify Bovis, DASNY and NYC in the underlying wrongful death action is (1) Liberty, up to the $1 million limit of its coverage, (2) upon exhaustion of QBE's and Liberty's coverage, Illinois, up to the $1 million limit of its coverage, and (3) upon exhaustion of QBE's, Liberty's and Illinois' coverage, United and Westchester, sharing on a pro rata basis, up to the respective limits of their policies, and (b) to declare further that, upon exhaustion of QBE's coverage, the order of the obligation to defend and indemnify Stonewall in the underlying wrongful death action is (1) Liberty, up to the $1 million limit of its coverage, and (2) upon exhaustion of QBE's and Liberty's coverage, Westchester, up to the $10 million limit of its coverage, and otherwise affirmed, without costs.