**CERTAIN UNDERWRITERS,**
**et al., Plaintiffs,**

v.

**ILLINOIS NATIONAL INSURANCE**
**CO., et al., Defendants.**

**No. 09 Civ. 04418(LAP).**

United States District Court,
S.D. New York.

Signed March 13, 2015.

Ira S. Lipsius, Lipsius–Benhaim Law, LLP, Kew Gardens, NY, Glenn Robert Kramer, Lipsius–Benhaim Law, LLP, New York, NY, Jack B. Gordon, Martin Richard Baach, Lewis Baach PLLC, Washington, DC, Joseph Lawrence Ruby, Lewis Baach Kaufmann Middlemiss, Lorienton N.A. Palmer, Schindel, Farman, Lipsius, Gardner & Rabinovich, L.L.P., New York, NY, for Plaintiffs.

Anthony Joseph Zarillo, Bevan, Mosca, Giuditta & Zarillo P.C., Basking Ridge, NJ, Jason Philip Gratt, Bevan, Mosca, Giuditta & Zarillo P.C., Watchung, NJ, Christopher R. Carroll, Heather Elizabeth Simpson, Carroll, McNulty & Kull L.L.C., Basking Ridge, NJ, John Paul De Filippis, Tyler Jay Lory, Clausen Miller P.C., Andrew M. Premisler, Lazare Potter & Giacovas, LLP, New York, NY, Nicholas P. Calabria, Churbuck Calabria Jones & Materazo, P.C., Hicksville, NY, for Defendants.

## MEMORANDUM & ORDER

LORETTA A. PRESKA, Chief Judge:

Plaintiffs filed a motion for partial summary judgment [dkt. no. 284] asking this Court to determine the priority of coverage among insurance policies issued by Plaintiffs (i.e., Certain Underwriters at Lloyd's of London, Aspen Insurance UK Ltd., and Arch Insurance Company (Europe) Ltd. (collectively "Underwriters")), Defendant Continental Casualty Company ("Continental"), and Defendant Insurance Company of the State of Pennsylvania ("ICSOP"). Continental subsequently filed a cross-motion for partial summary judgment [dkt. no. 291] regarding the

same issue. For the reasons below, Plaintiffs' motion is GRANTED, and Defendant Continental's motion is DENIED.

## I. FACTS

This dispute arises out of an accident that took place on December 14, 2007 at the construction site of Goldman Sachs's new world headquarters.[1] (Pl. 56.1 Stmt. ¶ 1; Def. 56.1 Stmt. ¶¶ 4–6.) That day, Wilbert Rocco, an employee of Norbet Trucking ("Norbet") delivered metal studs to the site in a flatbed trailer. (*Id.* ¶ 4.) In the course of unloading the truck with a crane, the studs fell and injured Rocco and another individual named Robert Woo. (Pl. 56.1 Stmt. ¶¶ 1–2.) Following the accident, Rocco and Woo brought lawsuits in New York state court against Goldman Sachs, its contractors, and others, which they ultimately settled. (Def. 56.1 Stmt. ¶ 23.) Underwriters paid $19.85 million toward those settlements and subsequently brought the present diversity action alleging that Defendants' insurance policies covered the accident and that they are obligated to contribute to the costs of the settlements. (*Id.* ¶ 24.)

A number of different insurance policies provided coverage that extended to this accident, but for purposes of the present cross-motions, the Court focuses on only three providers. First, ICSOP issued a truckers' liability policy to Norbet providing $1,000,000 in coverage. (*Id.* ¶ 16; Pl. 56.1 Stmt. ¶ 7.) That policy explicitly identified itself in its "Other Insurance" clause as "primary for any covered 'auto' while

hired or borrowed" by Norbet and used in its trucking business. (*Id.* ¶ 9.)

Second, Continental issued a commercial umbrella liability policy to Norbet providing $25,000,000 in coverage. (Def. 56.1 Smt. ¶ 17; Pl. 56.1 Stmt. ¶¶ 10–13.) That policy provided coverage "in excess of scheduled underlying insurance, [or] unscheduled underlying insurance," specifically identifying the ICSOP Policy as "scheduled underlying insurance." (*Id.* ¶¶ 14, 16; Def. 56.1 Stmt. ¶¶ 18–19.) Continental's "Other Insurance" clause provided:

> This insurance is excess over and will not contribute with any other insurance available to the insured whether such insurance is stated to be primary, contributory, excess, contingent or otherwise. This condition does not apply to insurance purchased specifically to apply in excess of this insurance.

(*Id.* ¶ 21.) Continental's policy provided approximately fifteen months of coverage from March 31, 2007 through July 1, 2008 and included a premium of $425,826. (*Id.* ¶¶ 17, 22.)

Third, Underwriters issued joint policy Nos. 509/DL458805 and 509/DL460005 to Goldman Sachs providing $25,000,000 in excess liability coverage. (Pl. 56.1 Stmt. ¶¶ 17–19.) Underwriters' "Other Insurance" clause provided:

> If there is any other collectible insurance available to the Insured (whether such insurance is to be primary, contributing, excess or contingent) that covers a loss that is also covered by this policy,

---

1. The facts in this section are drawn from the undisputed portions of the parties' respective Local Rule 56.1 statements and counterstatements of material facts. (Underwriters' Rule 56.1 Statement of Undisputed Material Facts [dkt. no. 287] dated Aug. 13, 2014 ("Pl. 56.1 Stmt."); Continental Casualty Company's Response to Plaintiff's Rule 56.1 Statement and

Continental's Rule 56.1 Counterstatement of Material Undisputed Facts [dkt. no. 294] dated Sept. 12, 2014 ("Def. 56.1 Stmt."); Underwriters' Rule 56.1 Response to Continental's Counterstatement of Undisputed Facts [dkt. no. 298] dated Oct. 8, 2014 ("Pl. 56.1 Reply").)

the insurance provided by the policy will apply in excess of, and shall not contribute with such insurance, unless a contract specifically requires that this insurance be primary and non-contributory. (Decl. of Ira S. Lipsius in Support of Underwriters' Motion for Partial Summary Judgment [dkt. no. 286] dated Aug. 13, 2014 ("Lipsius Decl."), Ex. D at UND00461.) Underwriters' policies provided five years of coverage from November 28, 2005 to November 28, 2010 and included a minimum premium of $3,362,500. (*Id.* Ex. D at UND00456; Def. 56.1 Stmt. ¶ 11.) Those policies were incorporated into an Owner Controlled Insurance Program ("OCIP") that jointly insured Goldman Sachs, the construction project managers, some contractors, and some subcontractors. (Decl. of Christopher R. Carrol [dkt. no. 293] dated Sept. 12, 2014 ("Carrol Decl."), Ex. A.) Covered contractors were required to remove any insurance premium costs from their respective bids for the project, though they were permitted to obtain additional insurance at their own option and expense. (*Id.* Ex. A at 4; Pl. 56.1 Reply ¶¶ 1–2.) The OCIP included $2 million in primary general liability coverage from Illinois National Insurance Co. and listed Underwriters' policies as "Layer 1" of four layers of "Excess Liability" coverage. (*Id.* ¶¶ 11–12; Def. 56.1 Stmt. ¶ 9; Carrol Decl. Ex. A at 29–30.) Excluded from the OCIP were certain parties, including truckers, haulers, and drivers such as Norbet, who were required to obtain their own coverage, including automobile insurance. (*See Id.* Ex. A at 6, 17–20.)

This Court has already decided in a previous Memorandum Opinion and Order that both the ICSOP and the Continental policies covered Norbet and applied to the loss from the accident that injured Rocco and Woo. (*See* Memorandum Opinion and Order [dkt. no. 181] dated Feb. 25, 2011, at 6–10.) The parties are still engaged in discovery regarding certain issues that may impact their obligation to make particular payments, but all are in agreement that there are no genuine disputes of any material facts regarding priority of coverage. Accordingly, the parties have now asked the Court to consider the discrete issue of the order in which each insurer must contribute to the cost of the settlements.

## II. APPLICABLE LAW

A moving party is entitled to summary judgment only where the record makes clear that "there is no genuine issue as to any material fact," and "the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)) (internal quotation mark omitted). A fact is material if it "might affect the outcome of the suit under the governing law...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* When considering cross-motions for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir.1993) (quoting *Schwabenbauer v. Bd. of Educ. of Olean,* 667 F.2d 305, 314 (2d Cir.1981)) (internal quotation marks omitted).

Because this is a diversity action, the Court must first determine which state's law applies to the priority of insurance issue before proceeding to the merits. "Federal courts sitting in diversity look to

the choice-of-law rules of the forum state," and this Court accordingly turns to New York choice of law rules. *Int'l Bus. Machs. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir.2004). As a preliminary matter, courts need not undertake a choice of law analysis unless there is a conflict between the applicable laws of the relevant jurisdictions. *See Matter of Allstate Ins. Co.*, 81 N.Y.2d 219, 223, 597 N.Y.S.2d 904, 613 N.E.2d 936 (N.Y.1993); *Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 566 (2d Cir.2011). Because Underwriters' policies are governed by New York law, while both ICSOP's and Continental's policies are governed by New Jersey law, those two states are the relevant jurisdictions here. (*See* Memorandum Opinion and Order [dkt. no. 181] dated Feb. 25, 2011, at 6–10.) the present motions because there is no conflict between New Jersey and New York law regarding priority of coverage. (*See* Underwriters' Mem. of Law [dkt. no. 285] dated Aug. 13, 2014 ("Pl. Mem."), at 7.) In response, Continental points out that this Court and the Court of Appeals have both previously determined that its policy and ICSOP's policy are governed by New Jersey law, but it nonetheless proceeds to cite both New York and New Jersey law in its argument regarding coverage priority without disputing the lack of conflict between the two jurisdictions on this particular issue. (Continental Casualty Co.'s Mem. of Law [dkt. no. 292] dated Sept. 12, 2014 ("Continental Mem."), at 9.) The Court agrees that there is no conflict between New York and New Jersey law here, as both apply the same analysis to the "other insurance" clauses of policies that cover the same risk to determine the order in which they should pay and both require policies with identical coverage to divide costs *pro rata*. *Compare Sport Rock Int'l, Inc. v. Am. Cas. Co. of Reading, PA*, 65 A.D.3d 12, 878 N.Y.S.2d 339, 345–49 (1st Dept.2009), *with Universal Underwriters Ins. Co. v. CNA Ins. Co.*, 308 N.J.Super. 415, 417–18, 706 A.2d 217 (N.J.App.Div.1998). Accordingly, there is no need to conduct a choice of law analysis, and the Court applies New York law to this issue.[2] *See Elson v. Defren*, 283 A.D.2d 109, 726 N.Y.S.2d 407, 411 (1st Dept.2001).

When evaluating priority of coverage, New York courts consider each applicable policy's language, recognizing "the right of each insurer to rely upon the terms of its own contract with its insured." *State Farm Fire & Cas. Co. v. LiMauro*, 65 N.Y.2d 369, 373, 492 N.Y.S.2d 534, 482 N.E.2d 13 (N.Y.1985). Generally, a policy that identifies itself as primary must pay out its entire limit first, followed by policies that were intended to be excess. *See Utica Mut. Ins. Co. v. Erie Ins. Co.*, 107 A.D.3d 1522, 966 N.Y.S.2d 790, 792 (4th Dept.2013). If multiple policies cover "the same risk" because each "was sold to provide the same level of coverage," then "priority of coverage (or, alternatively, allocation of coverage) among the policies is determined by comparison of their respective 'other insurance' clauses." *Sport Rock*, 878 N.Y.S.2d at 344. Should that analysis reveal that multiple insurers "con-

---

**2.** New York choice of law rules permit application of different jurisdictions' law to distinct legal questions within a single case. *See Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 397 n. 1 (2d Cir.2001); *Hutner v. Greene*, 734 F.2d 896, 901 (2d Cir.1984); *Babcock v. Jackson*, 12 N.Y.2d 473, 484, 240 N.Y.S.2d 743, 191 N.E.2d 279 (N.Y.1963). Thus, although

New Jersey law applied when considering whether the ICSOP and Continental policies covered the accident, New York law may nonetheless apply to the separate question regarding the priority of coverage among Underwriters' New York policies, ICSOP's New Jersey policy, and Continental's New Jersey policy.

tracted to cover the same risk on the same level," however, none may "argue that the other must bear the entire risk because the effect of a contrary holding would be to leave the insured with no coverage at all." *LiMauro*, 65 N.Y.2d at 373–74, 492 N.Y.S.2d 534, 482 N.E.2d 13 (citations omitted). Rather, "the excess coverage clauses are deemed to cancel each other out and each carrier is required to contribute ratably" after any primary coverage has been paid out in full. *Id.* at 374, 492 N.Y.S.2d 534, 482 N.E.2d 13. In applying this rule, courts must not "distort the meaning of the terms of the policies involved" and are required to consider "the purpose each policy was intended to serve as evidenced by both its stated coverage and the premium paid for it, as well as upon the wording of its provision concerning excess insurance." *Id.*

## III. DISCUSSION

Among the three insurers at issue in these cross-motions for summary judgment, one may be disposed of quickly. Both Underwriters and Continental agree that ICSOP's policy is primary and ahead of their excess policies. (Pl. Mem. at 8–9; Continental Mem. at 10.) Although IC-SOP continues to dispute whether it is obligated to make any payments, it has not opposed either of the present motions, apparently conceding that it provided primary coverage and that if it is ultimately required to pay out its policy, it must do so ahead of Continental and Underwriters.[3] (*See* ICSOP Ltr. [dkt. no. 300] dated Nov.

3, 2014.) *See Utica Mut. Ins. Co.*, 966 N.Y.S.2d at 792. Because ICSOP's policy describes itself as "primary," and because Continental's policy lists ICSOP's policy on its schedule of underlying insurance, the Court agrees with the parties and finds that ICSOP's policy is primary and ahead of both Continental and Underwriters' policies. (Lipsius Decl. Ex. B at ISOP00064.)

■ The more contentious issue is the order of priority between Continental and Underwriters. Underwriters argue that the two policies are both excess policies with identical "other insurance" clauses and should therefore contribute ratably after ICSOP's policy. By contrast, Continental argues that Underwriters' "other insurance" clause employs a different exception from Continental's and that Underwriters' inclusion in OCIP triggered their exception language, converting Underwriters' policies to primary-type below Continental's purely excess policy.

In evaluating this question, the Court first looks to the language of the competing policies. *See Sport Rock*, 878 N.Y.S.2d at 345–46. Both have virtually indistinguishable "other insurance" clauses, which purport to raise their policies above all other applicable insurance, including excess policies. (*See* Lipsius Decl. Ex. C at CCC00028; *Id.* Ex. D at UND00461.) The only difference between the two clauses is in the wording of their exceptions. While Continental carves out only "insurance purchased specifically to apply in excess

**3.** Underwriters attempted to use ICSOP's decision not to oppose either motion for summary judgment as a concession of liability. (*See* Underwriters' Reply Mem. of Law [dkt. no. 299] dated Oct. 8, 2014 ("Pl. Reply"), at 1 n. 1.) In response, ICSOP wrote to the Court to clarify that it merely chose to forego briefing on the priority issue but has by no means waived its right to dispute its duty to pay on other grounds. (*See* ICSOP Ltr.) Because the

present motions only determine a discrete issue and do not resolve this entire case, the Court agrees with ICSOP and declines to enter judgment against it here. The Court's finding today only means that if ICSOP is ultimately required to contribute to the costs of this accident, it must pay out its entire policy before either Continental or Underwriters must contribute.

'of" its policy, Underwriters make an exception where "a contract specifically requires that this insurance be primary and non-contributory." (*Id.* Ex. C at CCC00028; *id.* Ex. D. at UND00461.) Although the two are similar, Underwriters' contemplates an agreement other than a new insurance policy between third parties that can change the nature of its policy, while Continental's only contemplates a new policy placed above it by that policy's own explicit terms. *Compare Pecker Iron Works of N.Y. v. Traveler's Ins. Co.*, 99 N.Y.2d 391, 394, 756 N.Y.S.2d 822, 786 N.E.2d 863 (2003) ("Pursuant to the policy provision at issue, Travelers agreed to provide primary insurance to any party with whom Upfront had contracted in writing for insurance to apply on a primary basis. When Upfront agreed to it, the policy provision was satisfied."), *with Tishman Constr. Corp. of N.Y. v. Great Am. Ins. Co.*, 53 A.D.3d 416, 861 N.Y.S.2d 38, 42 (1st Dept.2008) ("[A] reference in an insurance policy to insurance specifically purchased to apply in excess of the subject policy (or similar phraseology) means a higher-level policy that specifically designates the subject policy as underlying insurance." (quoting *Bovis Lend Lease LMB, Inc. v. Great Am. Ins. Co.*, 53 A.D.3d 140, 855 N.Y.S.2d 459, 469 (1st Dept.2008)) (internal quotation marks omitted)). As such, the two "other insurance" clauses seek to place their respective policies at an excess-over-excess level and must "cancel each other out" unless an exception clause applies to convert one of the policies to a lower level of coverage. *LiMauro*, 65 N.Y.2d at 374, 492 N.Y.S.2d 534, 482 N.E.2d 13; *Sport Rock*, 878 N.Y.S.2d at 347–49.

As an initial matter, Continental's exception clearly has not been triggered because there is no identifiable insurance that has been purchased "specifically to apply in excess" of Continental.[4] (Lipsius Decl. Ex. C at CCC00028.) The parties' dispute thus hinges on whether OCIP constitutes "a contract [that] specifically requires that [Underwriters' policies] be primary and non-contributory." (*Id.* Decl. D. at UND00461.) In arguing that Underwriters' exception is triggered, however, Continental points to no express language in the OCIP manual or any other contract that explicitly converts the Underwriters' policies into primary and non-contributory coverage for any insured. Rather, the OCIP manual lists Underwriters' policies as "Excess" and sets out a $2 million policy from Illinois National Insurance Co. as primary underlying insurance. (Carroll Decl. Ex. A at 29–30.) Indeed, the OCIP manual guarantees certain contractors and subcontractors both general liability and excess insurance while instructing readers that they "should refer to the policies for actual terms and conditions." (*Id.* Ex. A at 27.) The manual thus clarifies that it does not alter the substance of any included policies, which further suggests that it has not triggered the exception to Underwriters' "other insurance" clause.

Continental also fails to explain how the Underwriters' policy can be primary within the terms of its "other insurance" clause exception but still excess and noncontributory to ICSOP's primary policy, as it conceded in its briefing. (*See* Continental Mem. at 10.) The best argument that

---

**4.** Underwriters attempt to argue in the alternative that because Continental's policy characterizes itself as umbrella coverage, it is somehow a lower level of coverage than Underwriters' pure excess policies. This argument is unsupported by any case law, and Continental correctly points out that it is further undermined by ICSOP's status as a primary insurer to which Continental's policy is unquestionably excess. (*See* Lipsius Decl. Ex. C at CCC00006.)

might be made in support of Continental's position is that by placing other excess policies in tiers above the Underwriters' policies, OCIP triggered the exception by converting Underwriters to primary-type and non-contributory beneath the other three tiers of OCIP excess insurance but still above any purely primary policies. Yet this reasoning overlooks the language of the Underwriters' policies, which only opens itself up to adjustment where a contract *"specifically* requires that this insurance be primary and non-contributory." (Lipsius Decl. Ex. D. at UND00461 (emphasis added).) OCIP does no such thing; rather, it refers to Underwriters' policies as excess and explicitly indicates that Underwriters' own policies control in the OCIP coverage. (*See* Carroll Decl. Ex. A at 27, 30.)

Continental argues that Underwriters' policies should be treated like the policy in *Pecker.* That case considered a primary policy with a provision indicating that for certain "additional insureds, coverage would only be excess, unless [the insured] agreed in a written contract for this insurance to apply on a primary or contributory basis." *Pecker Iron Works of N.Y.,* 99 N.Y.2d at 393, 756 N.Y.S.2d 822, 786 N.E.2d 863 (internal quotation marks omitted). The New York Court of Appeals held that because "additional insured" is a term of art meaning an individual who receives "the same protection as the named insured," the contract with Pecker, which promised to list Pecker as an "additional insured" on the insured's primary policy, triggered the exception and provided the same primary protection to Pecker as it did to the original insured. *Id.* (quoting *Del Bello v. Gen. Accident Ins. Co. of Am.,* 185 A.D.2d 691, 585 N.Y.S.2d 918, 918 (4th Dept.1992)) (internal quotation marks omitted). By contrast, Underwriters' policies provide only excess coverage, so even if OCIP added additional insureds

to those policies, under the reasoning in *Pecker,* they would receive the same level of protection as the original insureds, i.e., excess coverage.

Continental attempts to circumvent this reasoning by arguing that the OCIP as a whole—including the primary and four layers of excess policies—constitutes primary insurance because covered contractors and subcontractors were required to remove any insurance premiums from their bids. In this way, Continental recognizes that the Underwriters' policies are indeed excess but nonetheless suggests that Underwriters' insureds implicitly contracted to provide coverage through OCIP that would be exclusive of and primary before any other excess insurance. Yet the language of the OCIP Manual forecloses such an interpretation by permitting covered contractors and subcontractors to obtain other insurance for on-site risks at their own expense and by excluding certain parties entirely from OCIP. (*See* Carroll Decl. Ex. A at 4, 6.) Specifically, truckers such as Norbet were left out of OCIP and expressly required to maintain their own insurance, including automobile policies. (*See id.* Ex. A at 6, 17–20.) Thus, OCIP contemplated other insurance policies that would cover particular liabilities involved in the construction project, including those arising out of the use of automobiles and actions of any truckers on site. These provisions further undermine Continental's attempt to identify OCIP as a contract that implicitly triggers the exception to Underwriters' "other insurance" clause. Because OCIP constitutes neither an express nor an implied contract triggering that exception, both "other insurance" clauses remain in effect and are mutually repugnant on their faces. *See Sport Rock,* 878 N.Y.S.2d at 347–49.

Continental nevertheless maintains that the purposes behind the two policies dem-

onstrate that Underwriters' should be treated as lower coverage than Continental's. Although Continental is correct that this Court must consider "the purpose each policy was intended to serve," this analysis does not change the conclusion dictated by the policies' text. *LiMauro*, 65 N.Y.2d at 374, 492 N.Y.S.2d 534, 482 N.E.2d 13. As already discussed, OCIP was intended to cover most risks on the construction site, but it made clear exclusions from its coverage for specific risks and parties. In particular, it excluded automobile insurance and trucking subcontractors such as Norbet from its coverage. (*See* Carroll Decl. Ex. A at 6, 17–20.) With this background in mind, Underwriters may have expected to cover any on-site losses over $2 million themselves, but where an automobile or trucker was involved, they were entitled to expect that other insurance policies would contribute to any losses. Similarly, although Continental had no specific reason to anticipate that it would contemplated covering losses resulting from the use of Norbet's trucks. In the unique circumstance of an accident occurring onsite but involving a trucker and use of an automobile, the equities therefore favor dividing the losses among those policies that contemplated on-site risks and those that contemplated automobile and trucking related risks.

Continental's other equity arguments do not disturb this conclusion. Though it correctly points out that the Court should consider the premiums paid for the respective policies, the disparate premiums Continental and Underwriters received appear related to the policies' duration and covered risks, rather than their level of coverage. *See LiMauro*, 65 N.Y.2d at 374, 492 N.Y.S.2d 534, 482 N.E.2d 13; *U.S. Fire Ins. Co. v. Fed. Ins. Co.*, 858 F.2d 882, 885 (2d Cir.1988). It is true that Continental received $425,826 for its $25,000,000 policy while Underwriters received a minimum premium deposit of $3,362,500 for the same limit, but Continental's policy lasted only fifteen months while Underwriters' lasted five years. (*See* Def. 56.1 Stmt. ¶¶ 11, 17, 22; Pl. 56.1 Stmt. ¶ 19; Lipsius Decl. Ex. D at UND00456.) The disparity may further be explained by contrasting Underwriters' coverage of multiple contractors and subcontractors on a massive construction site with Continental's coverage of trucking companies in their general work, not solely possibility of becoming a primary provider for additional insureds as the result of third party contracts, whereas Continental was guaranteed to remain excess at least to its underlying insurance policies for all insureds. Given these differences, the Court finds that the premium disparity reflects not a difference in coverage level, but rather "disparities in the degree of risk covered." *U.S. Fire Ins. Co.*, 858 F.2d at 885.

▮ Finally, Continental argues that if it must contribute *pro rata* with Underwriters, then the calculation of payments should employ the total OCIP coverage amount of $102 million, which includes the primary and four excess levels, and the total Norbet coverage amount of $26 million, which includes ICSOP and Continental. This proposal contradicts established New York law, which instructs that where two insurers must both contribute ratably, the calculation is based on the proportion of their respective policy limits to the remaining total loss without taking any other levels of coverage into account. *See, e.g., Jefferson Ins. Co. of N.Y. v. Travelers Indem. Co.*, 92 N.Y.2d 363, 372, 375, 681 N.Y.S.2d 208, 703 N.E.2d 1221 (N.Y.1998) (ordering two primary insurance carriers with equal policy limits to pay half of the covered cost each without factoring applicable excess policy purchased in a tier above one of the two primary policies into the calculation of that division). In the

absence of any New York cases that have prorated insurance contributions on the basis of the entire tower of coverage for a particular insured, this Court will not apply Continental's novel theory of contribution.

Accordingly, the Court finds that Underwriters' policies and Continental's policy provide the same level of coverage and must ratably divide any costs remaining after ICSOP pays out its policy. *See Bovis*, 855 N.Y.S.2d at 472. Based on the record before the Court, that division appears to be an even split, as Continental provides a $25 million limit, and the Underwriters' policies together provide a single $25 million limit. As such, subject to any additional substantive arguments that may arise following completion of discovery, Continental and Underwriters must each cover fifty percent of any remaining costs after ICSOP makes any necessary payment.

## CONCLUSION

After reviewing the record, the Court concludes that Underwriters have established the absence of any genuine disputes of material fact and that they are entitled to partial summary judgment as a matter of law with regard to priority of coverage. For the foregoing reasons, Plaintiffs' motion for partial summary judgment [dkt. no. 284] is hereby GRANTED, and Defendant Continental's cross-motion for partial summary judgment [dkt. no. 291] is hereby DENIED.

SO ORDERED.